[Cite as *Scheel v. Rock Ohio Caesars Cleveland, L.L.C.*, 2018-Ohio-3568.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106531

# SCOTT SCHEEL

PLAINTIFF-APPELLANT

vs.

# ROCK OHIO CAESARS CLEVELAND, L.L.C., ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-849942

**BEFORE:** Boyle, J., E.T. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** September 6, 2018

**ATTORNEYS FOR APPELLANT**

Robert D. Kehoe
Kevin P. Shannon
Kehoe & Associates, L.L.C.
900 Baker Building
1940 East Sixth Street
Cleveland, Ohio   44114-2210


**ATTORNEYS FOR APPELLEES**

**For Atlantis Security Company**

Elizabeth M. Midgley
Anspach Meeks & Ellenberger, L.L.P.
350 Main Street, Suite 2400
Buffalo, New York   14202

Joseph S. Center
Anspach Meeks & Ellenberger, L.L.P.
300 Madison Avenue, Suite 1600
Toledo, Ohio   43604-2633


**For Rock Ohio Caesars Cleveland, L.L.C.**

Robert H. Nichols
Juan Jose Perez
Andrew D. Wachtman
Perez & Morris L.L.C.
8000 Ravine's Edge Court, Suite 300
Columbus, Ohio   43235

MARY J. BOYLE, J.:

{¶1} Appellant, Scott Scheel, appeals the trial court's order granting summary judgment to appellee, Atlantis Security Company ("Atlantis"). He raises two assignments of error for our review:

> 1. The trial court erred in granting Atlantis's motion for summary judgment on Scheel's negligence claim where there is a question of fact about whether Atlantis had both a contractual and common law duty to provide police services and breached that duty, proximately causing Scheel's injury.
>
> 2. The trial court erred in granting Atlantis's motion for summary judgment on Scheel's spoliation of evidence claim where there is a question of fact about whether Atlantis was on notice of potential litigation and intentionally destroyed video footage which was necessary for Scheel to prove his case.

{¶2} Finding no merit to his assignments of error, we affirm.

## I. Procedural History and Factual Background

{¶3} Rock Ohio Caesars Cleveland, L.L.C. ("the Casino") is a company that owned a casino located in downtown Cleveland. The Casino opened in May 2012. Prior to its opening, the Casino realized that it could not have armed security personnel on its payroll. As a result, on May 14, 2012, the Casino entered into a contract ("the Security Agreement") with Atlantis, "a contract security management service [] in Northeastern Ohio [that employs] primarily security officers and Cleveland police officers."

{¶4} The Security Agreement stated that Atlantis will "provide the armed security services ('Services') as listed in Exhibit B." Exhibit B states that Atlantis is to "[p]rovide police services upon request of the [Casino.]"

{¶5} As part of accepting the bid, Atlantis also had to engage with One Six Security. One Six Security provided logistical support and training to the Casino, including "[o]fficer training that's outside the typical general practices of a police officer[, including] getting the [officers] to stay in the salutation of the day, making eye contact. More of a hospitality type of training."

{¶6} Under its agreement with the Casino, Atlantis officers were to man seven stations around the Casino, including two parking lots. Commander Deon McCaulley, who worked for Atlantis and was responsible for creating a schedule for Atlantis officers, stated that the Casino did not want Atlantis officers patrolling the gaming floors and that the Casino's own security staff patrolled the gaming floors. McCaulley stated that, instead, Atlantis officers were to "respond when * * * asked to do so" through the Casino's dispatch system.

{¶7} According to Scheel, on the evening of June 29, 2012, he and his then-fiancée, Christine, went to the Casino.[1] Around 1:45 a.m., Scheel sat down at a blackjack table next to Scott Greggor. While sitting at the table, Greggor began commenting on Scheel's polo shirt. Scheel stated that Greggor appeared intoxicated and slurred his words. Scheel stated that he tried to mind his own business and ignore Greggor who continued making comments about Scheel to another man who was also sitting at the table.

---

[1] Scheel and Christine are now married.

{¶8} Eventually Christine came over, and after hearing Greggor's continued comments, began exchanging words with Greggor, causing the conversation to escalate. At one point, Scheel told Greggor not to talk to Christine, to which Greggor responded, "How about I take you outside and kick your ass?"

{¶9} During this time, Alex Rotuno, an unarmed security guard employed by the Casino and wearing the Casino's tan security uniform, approached the men as the conversation continued to escalate and tried speaking with both men and Christine.

{¶10} Video footage from the Casino's surveillance cameras shows that seconds after Rotuno approached the table, Scheel stood up and got into Greggor's face. Scheel stated that he told Greggor that he "might want to stop doing what [he was] doing." Greggor then immediately stood up and pushed Scheel over his chair, causing Scheel to fall down and land with "all of [his] weight on [his] wrist[.]" According to Scheel, Greggor had pushed him over "within a minute or two" of the argument starting.

{¶11} The video shows that Greggor and Scheel wrestled with one another and that Christine also involved herself in the altercation, grabbing Greggor's head and throwing punches. The video shows that the fight lasted approximately 27 seconds and was eventually broken up by the Casino's security personnel. Atlantis officers did not arrive at the location until after the fight was over.

{¶12} Once the men were separated, Scheel and Christine were escorted to an interview room by the Casino's security personnel. During the interview, security personnel from both the Casino and Atlantis spoke with them. At one point, a Casino

employee informed Scheel that video surveillance showed that both men were responsible for the altercation. As a result, Scheel and Christine became upset and raised their voices, and Stephanie Maye, employed by Atlantis, entered the room and asked them to settle down. At one point, Maye took Christine's phone.

{¶13} During the interview, Scheel made a number of comments suggesting that he was going to file a lawsuit as a result of the incident and stated that he had legal counsel that would take care of the situation. He also told Christine that she did not know "how much [they] were going to make off of this."

{¶14} Thomas Lett, an Atlantis employee, also interviewed Scheel and Christine. Lett stated that the Casino had the incident on tape and that Scheel and Christine could get the Casino's reports later. The Casino permanently banned Scheel and Christine and escorted them out of the Casino.

{¶15} On August 19, 2015, Scheel refiled a complaint against the Casino and Atlantis for his injuries.[2] He set forth claims for negligence, false imprisonment, respondeat superior, and spoliation of evidence against the Casino and Atlantis. He also set forth claims for premises liability and dram shop liability against the Casino.

{¶16} The Casino and Atlantis filed answers denying wrongdoing and asserting affirmative defenses. Additionally, Atlantis set forth counterclaims against Scheel for spoliation of evidence and frivolous conduct under R.C. 2323.51. Scheel filed a reply denying Atlantis's counterclaims and asserting affirmative defenses.

---

[2] Scheel filed a complaint in June 2013, but voluntarily dismissed it in August 2014.

{¶17} The Casino and Atlantis filed motions to dismiss Scheel's false imprisonment claims, and the trial court granted both motions.

{¶18} The Casino and Atlantis also separately filed motions for summary judgment as to Scheel's remaining claims. Scheel opposed both motions. In support of his argument that genuine issues of material fact existed as to his claims, he attached an expert report from Terry Hulse, a private investigator who had previously worked as a corporate director of investigations and security for Harrah's Corporation, which owned gaming properties. In drafting his report, Hulse reviewed a number of depositions, video footage from the Casino, an "excerpt of the security plan," incident reports and daily logs from the Casino, and other documents. After reciting the factual background of the incident, Hulse concluded that "Atlantis security officers are hired to provide security services at the [Casino] and have a duty to protect [Casino] patrons." Noting that Atlantis officers were not permitted to "patrol the casino" and "took their direction from the [Casino's] security department[,]" Hulse believed that "Atlantis should have insisted that its officers be empowered to patrol the floor, rather than being confined to seven specific locations." He stated, "I believe that Atlantis officers had a duty to actually and actively ensure the safety of [the Casino's] patrons." He also stated that the altercation between Greggor and Scheel and Scheel's injury were foreseeable based on the prior incidents that occurred at the Casino.

{¶19} On August 9, 2016, the trial court granted Atlantis' motion for summary

judgment, but denied the Casino's motion.

**{¶20}** The matter proceeded to trial on Scheel's claims against the Casino. A few days later, before trial concluded, however, the Casino and Scheel settled, and the trial court dismissed the case.

**{¶21}** On October 3, 2016, Scheel appealed the trial court's decision granting Atlantis summary judgment. In *Scheel v. Rock Ohio Caesars Cleveland, L.L.C., d.b.a. Horseshoe Casino Cleveland*, 8th Dist. Cuyahoga No. 105037, 2017-Ohio-7174, we dismissed Scheel's appeal for lack of jurisdiction. Specifically, we found that there was not a final, appealable order because Atlantis' counterclaims against Scheel were unresolved. *Id.* at ¶ 21. As a result, we remanded the case to the trial court where Atlantis voluntarily dismissed its counterclaims against Scheel.

**{¶22}** With the jurisdictional issue now aside, Scheel refiled his appeal of the trial court's decision granting Atlantis' motion for summary judgment as to his claims for negligence and spoliation of evidence only. He is not appealing the trial court's order granting summary judgment to Atlantis on his claims for false imprisonment and respondeat superior.

## II. Law and Analysis

**{¶23}** In Scheel's assignments of error, he argues that the trial court erred in granting summary judgment to Atlantis. His first assignment of error concerns his claim for negligence and his second concerns his claim for spoliation of evidence.

{¶24} An appellate court reviews a trial court's decision to grant summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). De novo review means that this court independently "examine[s] the evidence to determine if as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal*, 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980). In other words, we review the trial court's decision without according the trial court any deference. *Smith v. Gold-Kaplan*, 8th Dist. Cuyahoga No. 100015, 2014-Ohio-1424, ¶ 9, citing *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 699 N.E.2d 534 (8th Dist.1997).

{¶25} Under Civ.R. 56(C), summary judgment is properly granted when (1) "there is no genuine issue as to any material fact"; (2) "the moving party is entitled to judgment as a matter of law"; and (3) "reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made[.]" *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978). Because it ends litigation, courts should carefully award summary judgment only after resolving all doubts in favor of the nonmoving party and finding that "reasonable minds can reach only an adverse conclusion" against the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992).

{¶26} "The burden of showing that no genuine issue exists as to any material fact falls upon the moving party. Once the moving party has met his burden, it is the

nonmoving party's obligation to present evidence on any issue for which that party bears the burden of production at trial." *Robinson v. J.C. Penney Co.*, 8th Dist. Cuyahoga Nos. 62389 and 63062, 1993 Ohio App. LEXIS 2633, 14 (May 20, 1993), citing *Harless* and *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991). "The moving party is entitled to summary judgment if the nonmoving party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Brandon/Wiant Co. v. Teamor*, 125 Ohio App.3d 442, 446, 708 N.E.2d 1024 (8th Dist.1998), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**A. Duty**

**{¶27}** To establish a claim for negligence, a plaintiff must show that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the plaintiff suffered an injury and damages as a direct and proximate result of that breach. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 680, 693 N.E.2d 271 (1998). If a defendant demonstrates that the plaintiff cannot prove any one of those elements, then the defendant is entitled to summary judgment. *Feichtner v. Cleveland*, 95 Ohio App.3d 388, 394, 642 N.E.2d 657 (8th Dist.1994).

**{¶28}** First, we examine whether Atlantis owed a duty to Scheel. "'If there is no duty, then no legal liability can arise on account of negligence. Where there is no obligation of care or caution, there can be no actionable negligence.'" *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614 (1989), quoting 70 Ohio Jurisprudence 3d,

Negligence, Section 13, at 53-54 (1986). The existence of a duty is a question of law. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22.

{¶29} Scheel raises two points to establish that Atlantis owed him a duty. First, he argues that Atlantis had a duty "to ensure that the [Casino's security] plan was adequate" based on the Security Agreement between Atlantis and the Casino. As an alternative to his first argument, Scheel also argues that, at the very least, there "are genuine issues of material fact * * * related to the duties the parties intended Atlantis to perform" under the Security Agreement, specifically because the Security Agreement's term, "police services," is ambiguous.

{¶30} Second, pointing to Hulse's expert report, Scheel argues that Atlantis owed him a duty to provide security services and prevent his injury because the altercation and his injury were foreseeable.

**1. Security Agreement**

{¶31} "Whether a security company owes a duty to a person injured by criminal activity on the premises, depends on the terms of the security company's contract with the premises owner." *Maier v. Serv-All Maintenance*, 124 Ohio App.3d 215, 221, 705 N.E.2d 1268 (8th Dist.1997), citing *Hill v. Sonitrol of S.W. Ohio*, 36 Ohio St.3d 36, 521 N.E.2d 780 (1988), and *Eagle v. Mathews-Click-Bauman, Inc.*, 104 Ohio App.3d 792, 663 N.E.2d 399 (10th Dist.1995). Courts have analyzed whether a security company, hired by a business, had a duty to the plaintiff by examining the contract or agreement

between the security company and the hiring business. *See Hill* at 39; *McCullion v. State Valley Mall Co.*, 7th Dist. Mahoning No. 97 CA 175, 2000 Ohio App. LEXIS 501 (Feb. 10, 2000); *Tomaro v. Brooklyn Shopping Ctr. Assocs.*, 8th Dist. Cuyahoga No. 74494, 1999 Ohio App. LEXIS 3844, 14-15 (Aug. 19, 1999); *Adelman v. Timman*, 117 Ohio App.3d 544, 551, 690 N.E.2d 1332 (8th Dist.1996); *Askew v. ABC Check Cashing*, 8th Dist. Cuyahoga No. 69906, 1996 Ohio App. LEXIS 4373, 16-17 (Oct. 3, 1996).

### a. The Casino Did Not Ask Atlantis to Ensure That Its Security Plan was Adequate.

**{¶32}** First, Scheel argues that Atlantis had a duty to "ensure that the [Casino's security] plan was adequate." The Security Agreement states that Atlantis employees are to provide "police services *upon request* of the [Casino]." (Emphasis added.) Scheel has set forth no evidence — and we can find none in the record — showing that the Casino requested Atlantis to take part in developing the security plan or to review or modify its security plan.

**{¶33}** Further, we will not place such a duty on a security company hired to perform specific contractual obligations by another company, unless specifically set forth in the contract between the parties. *See Maier* at 221 ("Whether a security company owes a duty to a person injured by criminal activity on the premises, depends on the terms of the security company's contract with the premises owner."). As a result, there are no genuine issues of material fact as to whether Atlantis had a duty under the Security Agreement to ensure that the Casino's security plan was adequate.

### b. The Security Agreement is Not Ambiguous

**{¶34}** Scheel further argues that the contract is ambiguous because it is unclear if "police services" included ensuring that the Casino's security plan was adequate.

**{¶35}** Here, the first page of the Security Agreement states, "[The Casino] hereby engages [Atlantis] to provide the armed security services ('Services') as listed in Exhibit B." Exhibit B, titled "Description of Services," states, under "Scope of Services," that Atlantis employees are to "[p]rovide police services *upon request of the client*, in accordance with this Service Agreement." (Emphasis added.)

**{¶36}** In support of his argument that the Security Agreement is ambiguous, Scheel cites to *Adelman*, where we analyzed whether a security company negligently provided security services to the plaintiff, who suffered injury and was an intended beneficiary of the security contract between the security company and the owner of the premises. We stated that to determine if there was "a duty to prevent a third person from causing harm to another[,]" it was necessary to examine the security contract. *Adelman*, 117 Ohio App.3d at 549-550, 690 N.E.2d 1332. The contract stated that the security company would "furnish * * * Security Personnel and will render services at such location or locations[.]" *Id*. at 550. The plaintiff and the security company disagreed as to whether that language required the security company's employees to protect the plaintiff from the injury that he suffered. We stated,

> Contracts are to be construed so as to give effect to the intent of the parties, and that intent is presumed as a matter of law to be fully revealed in the language the parties choose to incorporate into the agreement. * * * If the terms of a contract are clear and unambiguous, then its interpretation is a matter of law, and there is no issue of fact to be determined. * * * However,

> if a term cannot be determined from the four corners of the document, factual determination of intent may be necessary to supply the missing term.

*Id.* at 550.

**{¶37}** We found that "the intent of the agreement [was] not readily ascertainable from the four corners of the agreement[,]" and was "ambiguous as a matter of law." *Id.* We concluded that "[w]ithout knowing the intent of the contracting parties, it is not possible to determine whether a special relation existed between [the security company and the plaintiff] that would impose a duty upon the [security company]." *Id.* at 551. We therefore found that the trial court improperly granted summary judgment over the plaintiff's claim for negligence. *Id.*

**{¶38}** We find *Adelman* to be distinguishable because the evidence shows that the parties to the Security Agreement here, the Casino and Atlantis, did not intend for "police services" to include ensuring that the Casino's security plan was adequate. In fact, neither the Casino nor Atlantis, who were the only parties to the Security Agreement, dispute the fact that Atlantis was not permitted to or in charge of checking or modifying the security plan and that such a responsibility did not fall under "police services."

**{¶39}** Evidence submitted by Scheel's own expert supports this conclusion. Hulse's expert report notes that "despite their uniforms and firearms, Atlantis officers had very little actual authority at the time of Scheel's injuries. They could not patrol the casino floor or make arrests. Although hired to provide security for the casino, Atlantis took their direction from the [Casino's] security department." Hulse's report continued to state, "Thus, it is my opinion that Atlantis officers *should have been permitted* to patrol

the casino, rather than being stationed at seven specific sites at the casino." (Emphasis added.)

**{¶40}** During Hulse's deposition, he admitted that in forming his expert opinion, he never received the Casino's security plan and only reviewed an excerpt. When asked if he "assign[ed] any responsibilit[y] for [the altercation between Scheel and Greggor] to Atlantis[,]" Hulse said he did not.[3]

**{¶41}** Further, Section 11(q) of the Security Agreement states

[Atlantis'] employees shall comply with [the Casino's] security procedures at all times, and if any of [Atlantis'] employees is found to be in violation of such procedures by [the Casino], [the Casino] may remove them from [the Casino's] account or * * * property immediately, in [the Casino's] sole discretion.

**{¶42}** Moreover, Commander Deon McCaulley's testimony shows Atlantis' employees had little authority under the Security Agreement. McCaulley said he was hired by Atlantis immediately after it entered into the agreement with the Casino. He stated that it was his job "to determine how many officers [the casino] would need in order to staff the schedule that they were giving us" and that he was responsible for interviewing police officers to work at the Casino, making sure that those officers "abided by the rules and regulations by the Cleveland division of police or the Cuyahoga County

---

[3] Also during Hulse's deposition, he reviewed the Ohio Gaming Commission's meeting notes from April 18, 2012, which stated that the security plans submitted by the Casino "meet the requirements for minimum internal controls as established."

Sheriff's Office[,]" and "mak[ing] sure that they did the functions that the casino was asking us to perform."

{¶43} Discussing the weeks leading up to the Casino's opening, McCaulley said that he worked on deciding "how many police officers would be needed on a shift and where those police officers would be placed within the casino." He stated that in doing this, he worked with Joslyn Pennywell, the Casino's director of security, who was terminated prior to the Casino's opening. McCaulley explained that Brad Hirsch, Pennywell's supervisor, took over her security responsibilities. When asked what his "understanding of the role that Atlantis CPD would play versus the role that casino security would play[,]" McCaulley stated that "Mr. Hirsch * * * did make clear the role that he wanted CPD to play. He wanted us to certainly be friendly and inviting to the guests[.]"

{¶44} When asked whether the position he interviewed for "was to be in charge of security" at the casino, McCaulley stated,

> Not to be in charge of security. They have a security director at the Horseshoe. My position was to organize or put together a schedule of Cleveland police officers and Cuyahoga County sheriff's deputies, put together a schedule that would allow those officers and deputies to work inside of the casino.

He explained, "I wasn't part of putting together their overall security plan. But my understanding [was] that a component of that plan involved sworn police officers." McCaulley stated that he did not participate in developing the Casino's security plan and did not know if one existed.

**{¶45}** When asked about the locations of where Atlantis' employees were to stand in the Casino, McCaulley stated that he took "direction from the [Casino] management security staff as to where they thought [Atlantis officers] were best utilized as police officers." McCaulley also explained that in June 2012, the Casino "did not want a roving patrol[,] [s]o [Atlantis] did not patrol the gaming floor."

**{¶46}** Further, when asked about the interface between Atlantis and the Casino's own security personnel, McCaulley explained that Atlantis employees "respond when * * * asked to do so. [The Casino's security personnel has] a dispatcher that will call [Atlantis personnel's] attention to wherever it's needed." He also stated that "[a]n [Atlantis] officer will respond to wherever an altercation or argument is taking place." He stated that "if there is information that needs to be shared with [Atlantis] police officers, it was shared [through the dispatch system]." He explained that Atlantis security would respond to a location in the Casino if someone, through dispatch, communicated that they were needed. He also stated that dispatch did not share every report with Atlantis security personnel because "it was [not] necessary for [Atlantis] officers to see every incident that [the Casino's] security staff handled."

**{¶47}** When asked to explain what the Casino's request for a third-party security company called for, Kevin Jaite, Atlantis' senior vice president of operations, explained the Casino could not directly employ Cleveland police officers so it was "looking for a third party to administer the contract[.]" Jaite stated the Casino drafted the Security Agreement. When asked what the Casino's expectations of Atlantis officers were, Jaite

stated that Atlantis officers "had these fixed post positions[,]" including one officer at each door to the Casino, one officer in the poker room on the third floor, and one officer near the escalators on the second floor. In his affidavit attached to Atlantis' motion for summary judgment, Jaite also stated that "the casino determines where the CPD officers are stationed in the casino and how many." He also explained that while the Cleveland police officers "have stations [that they] are asked to be at[,]" the Casino's internal security patrol the floor. Jaite explained that the Cleveland police officers hired by Atlantis use general police practices while working at the Casino in addition to some general "dos and don'ts," which covered "their posture, not texting while they are working, how to report on and off the shift[,] [and] [w]here to stand." Jaite stated that the officers are in their full police uniforms, which includes their service weapons.

**{¶48}** As to the security plan, Jaite said the following during his deposition:

Q. [W]as there a security plan that somebody adopted? As you were going through this push training, did somebody have a plan for how the security of the casino would work and where CPD and Atlantis would fit in and where everybody else would fit in?

A. Yeah. We were working with Brad Hirsch from the casino at the time. He was the assistant general manager.

Q. Okay. My question was, did he have a plan?

A. Yes.

* * *

Q. Let's go back to Brad Hirsch and his plan, the one that wasn't in the book, but the plan that he had.

Tell me about how you * * * got an understanding of what Atlantis was supposed to be doing. So, for example, you told me there were going to be officers at different locations. How did you know that?

A. That was disseminated to us by either Brad or the casino.

* * *

Q. Okay. And Brad Hirsch is orchestrating BCI and One Six and casino people and Atlantis people and CPD, and somewhere in that training, you got an understanding from Brad that your Atlantis police officers were supposed to be stationed at four or five locations in the casino?

A. I think we had — I think we had maybe seven at the time, inside and outside. We had them all set out in the parking lot, in the Asher lot.

* * *

Q. All right. So at this initial training session that lasted a couple of days, via Brad Hirsch, you understood that Atlantis was supposed to be placing seven officers at seven locations throughout the casino and the parking lot; is that right?

A. That's primarily where we got our post positions from.

* * *

Q. All right. And I understand that the security plan did not call for Atlantis CPD to be patrolling?

A. Correct.

{¶49} Jaite explained that the Casino's security director determined the Casino's security officers' responsibilities versus those of the officers hired by Atlantis. Jaite stated that if the Casino's internal security "observe[s] something out of the ordinary or need[s] assistance, they will call or radio the police officer." He also explained that

Atlantis employees are told to address situations the same way they would as if they were on duty and that "[i]f a situation arises, they are required to respond accordingly."

{¶50} The following exchange also took place during Jaite's deposition:

Q. Did you have a hand in developing a security plan for the casino?
A. No.

Q. Have you ever seen a security plan for the casino?

A. No.

Q. Do you know if one exists?

A. No.

{¶51} Contrary to Scheel's argument that "police services" is ambiguous, the above evidence shows that there is no factual issue as to what "police services" meant in the Security Agreement. Neither the Casino nor Atlantis intended "police services" to mean developing, reviewing, or modifying the Casino's security plan. The evidence shows that the Casino developed the security plan, such as deciding that Atlantis would not patrol the gaming floor and would remain at seven designated locations until summoned by the Casino's dispatch system, and that Atlantis took no part in that development. Therefore, "while factual determination of intent may be necessary" in some cases, unlike *Adelman,* that is not the case here. Neither Scheel nor his expert created genuine issues of material fact by arguing that a term of a contract, to which Scheel was not a party, meant something other than what the actual parties involved intended the term to mean. Therefore, we disagree with Scheel that the Security Agreement is ambiguous.

**c. Atlantis Was Not Required to Perform More than Their Duties Under the Security Agreement.**

**{¶52}** Scheel also argues, pointing to his expert report, that Atlantis was negligent because its failure to involve itself in developing, modifying, or ensuring that the security plan was adequate was unreasonable. Scheel's argument seems to suggest that Atlantis should have contracted to do more under the Security Agreement and demanded that the Casino allow it to review and/or modify the security plan. We disagree.

**{¶53}** To find that Atlantis officers had a duty to protect Scheel by demanding that the Casino let them review or modify the security plan would go beyond the extent of Atlantis' contractual obligations. *See Deeds v. Am. Sec.*, 39 Ohio App.3d 31, 33-34, 528 N.E.2d 1308 (1st Dist.1987) ("[T]he agreement between Olde Montgomery and American Security * * * expressly limited Justice's security objective to the reduction of vandalism[.] We, therefore, find that Deeds failed to demonstrate the existence of a duty on the part of Justice in the execution of his employment duties as a security guard which would extend to her or would encompass the protection of her person on the premises."). Scheel's expert report does not create a genuine issue of material fact as to what the Security Agreement actually required Atlantis to do. *See id.* ("[T]he expert testimony and opinion sought to be elicited by Deeds * * * as to the generally accepted standard of conduct for a security guard and Justice's adherence to that standard would not have been helpful to the jury" based on the fact that the security guard's responsibilities were "expressly limited" by contract.). As a result, we find that Atlantis did not have a duty to

modify or ensure that the Casino's security plan was adequate under the Security Agreement.

**2. Foreseeability**

**{¶54}** Scheel also argues that Atlantis owed him a duty because his injury was foreseeable based on six incidents that occurred during the opening four weeks at the Casino prior to his fight with Greggor. While the incident reports are not detailed, the first six incidents can be summarized as follows:

1.  May 31, 2012, 8:17 p.m.: A fight occurred in the poker room between three patrons. All were escorted out of the Casino.

2.  June 3, 2012, 3:30 a.m.: An altercation occurred in the Ontario Street parking garage.

3.  June 14, 2012, 2:42 a.m.: An intoxicated guest in the World Series Poker Room began "behaving disorderly." Security officers from both the Casino and Atlantis engaged the intoxicated guest and escorted him to the cashier and eventually the bathroom, where he became hostile. The guest was eventually escorted out of the Casino and put on a 24-hour eviction. The guest returned later that day, where he was again escorted out of the Casino and placed on a permanent eviction.

4.  June 16, 2012, 3:57 a.m.: An altercation occurred on the gaming floor between two patrons, who were permanently evicted.

5.  June 16, 2012, 10:57 p.m.: While a patron waited for his girlfriend to exit the restroom, another patron walked by and "slightly brush[ed] his arm." The patrons, along with another male, began fighting near the Casino's food court. After the fight was broken up, all three men were escorted out of the Casino and permanently banned.

6.  June 16, 2012, 11:10 p.m.: An altercation occurred between multiple patrons on the second floor of the Casino.

**{¶55}** Those incidents, however, do not show that Scheel's injury was foreseeable to Atlantis: first, because Atlantis officers were not present before or during the fight because they did not receive a dispatch until after the fight was over and, second, because Atlantis was not even provided the reports of the above-described incidents.

**{¶56}** With respect to the incident in this case, Hulse's expert report states

> The fight between the three participants (Scheel, Speigel and Greggor) lasted approximately 27 seconds and was witnessed by as many as six Horseshoe security officers who were standing idly by in the immediate area. None of the security officers present made any attempt to stop the fight until a break in the action occurred that allowed the officers to step between the fighting guests. *Atlantis Security (CPD) appears to arrive on the scene a full ten seconds after the fight ends and the participants are separated.*

(Emphasis added.) Hulse's statement shows that Atlantis employees were not aware of the verbal dispute, did not know that the altercation was occurring, and did not arrive at the location until after the altercation ended. In fact, Scheel has not offered any evidence showing that Atlantis employees were made aware of circumstances suggesting that a physical altercation was imminent before Scheel had already suffered his injury. Atlantis employees' lack of awareness was not their fault. Instead, as noted earlier, Atlantis employees were stationed at seven spots throughout the Casino and parking areas, could not patrol the floors, and only left their designated stations when dispatched. This was part of the Casino's security plan, under which, as Commander McCaulley stated, Atlantis security personnel would "respond when * * * asked to do so * * * [because the Casino] did not want a roving patrol."

**{¶57}** Further, as to the prior incidents at the Casino, the record shows that Atlantis employees did not receive every incident report. Commander McCaulley explained that whether Atlantis employees receive an incident report "depends on the circumstance." He said

> [I]f there is information that needs to be shared with police officers, it was shared. But I don't think that it was a situation with every report that [the Casino] made, [it] actually, shared it with CPD. I don't think it was necessary for our officers to see every incident that their security staff handled.

**{¶58}** Moreover, Hulse's report states, "Perhaps even more egregious is the fact that Atlantis was unaware of any incidents at the casino at the time of Scheel's injuries. Jaite said that Atlantis does not receive or review reports of fights or arrests, and that it does not have access to the casino's i-Track system."

**{¶59}** Thus, the evidence establishes that, if anything, Scheel's injury was foreseeable to the Casino, whose security personnel and gaming employees were present during the verbal altercation and had access to the reports detailing the prior incidents. Therefore, we reject Scheel's argument that Atlantis owed him a duty to prevent his injury because it was foreseeable.

**{¶60}** Accordingly, we find that Atlantis did not owe Scheel a duty, overrule his first assignment of error, and affirm the trial court's order granting Atlantis summary judgment as to Scheel's claim for negligence.

**B. Spoliation of Evidence**

**{¶61}** Turning to his claim for spoliation of evidence, Scheel argues that the trial court should not have granted Atlantis' motion for summary judgment because Atlantis "was responsible for investigating incidents and preserving evidence at the casino" and "intentionally deleted" surveillance footage of the moments leading up to his physical altercation with Greggor.

**{¶62}** To establish a claim for spoliation of evidence, a plaintiff must prove the following: (1) pending or probable litigation involving the plaintiff, (2) that the defendant knew that litigation exists or is probable, (3) willful destruction of evidence by the defendant designed to disrupt the plaintiff's case, (4) actual disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's actions. *Elliott-Thomas v. Smith*, Slip Opinion No. 2018-Ohio-1783, ¶ 10, citing *Smith v. Howard Johnson Co.*, 67 Ohio St.3d 28, 29, 615 N.E.2d 1037 (1993).

**{¶63}** In its motion for summary judgment, Atlantis conceded that Scheel established the first and second elements, but argued that Scheel could not show or create a genuine issue of material fact as to the third element — that Atlantis willfully destroyed surveillance footage. Atlantis argued in its motion for summary judgment and in its appellate brief that it could not have willfully destroyed the evidence because it did not own, control, or have any influence over the surveillance footage.

**{¶64}** Scheel cites to *Abbott v. Marshalls of MA, Inc.*, 8th Dist. Cuyahoga No. 87860, 2007-Ohio-1146, in support of his argument. In that case, a loss prevention specialist from the store physically apprehended a customer after he suspected that she

was trying to steal perfume. The customer eventually sued the store and asserted a number of claims, including spoliation of evidence. That claim was based on missing video footage of the customer in the store as well as the loss prevention specialist's confrontation and interview of the customer. Further,

> [d]uring the time of the incident, Marshalls had a highly sophisticated multiplex video surveillance system that recorded Abbott's entire visit in the store. Footage had been recorded of Abbott while she was in the domestics department, allegedly in a "blind spot" where Ladwig stated she placed the bottle of perfume in her purse; however, Ladwig taped over the footage the very next day, despite Marshalls' policy that all multiplex tapes must be kept for a minimum of 31 days.

*Id*. at ¶ 13.

{¶65} On an appeal from a jury verdict in favor of the customer, the appellant-store argued that the court erred in denying its motion for summary judgment as to the customer's spoliation claim. We disagreed and found that the customer provided "more than sufficient evidence to support her claim for spoliation, showing that genuine issues of material fact remained to litigate at trial." *Id.* at ¶ 57.

{¶66} The instant case is distinguishable from *Abbott*. Here, Atlantis officers were not Casino employees, and unlike the employee in *Abbott*, McCaulley stated that Atlantis employees did not have access to the Casino's surveillance cameras. Jaite explained that Atlantis would have to get surveillance tapes from the Casino. In his affidavit, Jaite stated that "CPD officers do not control video surveillance or the surveillance cameras, and do not have a fixed position in the surveillance room."

{¶67} Despite offering no evidence that Atlantis had access to or control of the

video surveillance, Scheel argues that whether Atlantis had access or control should be determined by a jury. We disagree.

> "[C]auses of action for spoliation of evidence are designed to place responsibility and accountability on parties who were *actually in possession of evidence* that existed at one time but who later do not provide this evidence and do not provide an adequate explanation for failing to do so."

(Emphasis added.) *Wheatley v. Marietta College*, 4th Dist. Washington No. 14CA18, 2016-Ohio-949, ¶ 105, quoting *Keen v. Hardin Mem. Hosp.*, 3d Dist. Hardin No. 6-03-08, 2003-Ohio-6707. "A spoliation claim cannot be based upon conjecture that evidence might have existed and that a party might have destroyed it." *Id.*, citing *Keen*. Here, Scheel has offered no evidence creating a genuine issue of material fact as to whether Atlantis had possession or control of the surveillance video. As a result, summary judgment was appropriate, and we overrule Scheel's second assignment of error.

**{¶68}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., CONCURS;
PATRICIA ANN BLACKMON, J., DISSENTS IN PART WITH SEPARATE OPINION


PATRICIA ANN BLACKMON, J., DISSENTING IN PART:

{¶69} I respectfully dissent in part from the majority opinion affirming the trial court's granting summary judgment to Atlantis Security Company.

{¶70} Although I appreciate the court's well-reasoned concerns, I do not agree with its determination that Atlantis owed Scheel no duty because his injury was not foreseeable. Years ago, Judge Benjamin Cardozo wrote, "The risk reasonably to be perceived defines the duty to be obeyed * * *." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99 (1928).

{¶71} Atlantis has a duty to provide "police services" per its agreement with the Casino, and in my opinion, there is a foreseeable risk of fights occurring in a casino. Consequently, security is needed. Otherwise, why hire a security company? Having established a duty based on the foreseeability of fights resulting in injuries at a casino, I would find that factual issues exist as to whether Atlantis breached this duty given the circumstances in Scheel's case. For example, where were Atlantis employees assigned to be, and was this altercation visible to any employees at the time? These are factual issues to be decided by factfinders.

{¶72} I agree with the majority's finding that Atlantis did not have a duty to ensure that the Casino's security plan was adequate. However, I would sustain Scheel's first assigned error in part, and find that summary judgment was improperly granted regarding

whether Atlantis breached its duty to provide "police services" as related to Scheel's injuries.